RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK

DATE _3_/_3_/_14_

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

b

SHARLENE GRANT, et al.,
      Petitioner

VERSUS

POLICE DEPT. for the CITY OF
NATCHITOCHES, et al.,
      Respondent

CIVIL ACTION
1:12-cv-02582

JUDGE JAMES T. TRIMBLE
MAGISTRATE JUDGE JAMES D. KIRK

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

    Before the court is a wrongful death and survival action filed pursuant to 42 U.S.C. § 1983 and supplemental state law claims under La.C.C. arts. 2315, 2317 and 2320[1] by plaintiff Sharlene Grant ("Grant")(individually and on behalf of three minor children) and O'Shay Hicks ("Hicks") on September 26, 2012, and amended on January 25, 2013 (Doc. 14). The remaining defendants are Natchitoches Parish Sheriff Victor Jones, Jr., Deputy Herman G. Sers (employed by Sheriff Jones), Deputy Derrick Caballero

---

    [1] District courts have "supplemental jurisdiction" over claims so related to a federal question "that they form part of the same case or controversy", 28 U.S.C. §1367(a). Rodriguez v. Pacificare of Texas, Inc., 980 F.2d 1014, 1018-19 (5th Cir.), cert. den., 508 U.S. 956, 113 S.Ct. 2456 (1993); Whalen v. Carter, 954 F.2d 1087, 1097 (5th Cir. 1992).

(employed by Sheriff Jones), Unknown Employees of the Natchitoches Parish Sheriff, the City of Natchitoches, Sergeant Billy Meziere (employed by the City of Natchitoches Police Department), Deputy Richard Shane Lacaze (employed by the City of Natchitoches Police Department), and Officer Floyd Evans (employed by the City of Natchitoches Police Department).[2]    Plaintiffs allege that defendants used excessive force against Marlon Grant and falsely arrested him on September 26, 2011.  For relief, plaintiffs ask for a jury trial, general, special and punitive monetary damages, attorney fees, expert witness fees, and costs.

In their complaint, Grant and Hicks allege that Marlon Grant was husband to Sharlene Grant, father to O'Shay Hicks, and father to three minor children.  Grant and Hicks further allege in their complaint that, on September 26, 2011, Marlon J. Grant was a passenger in a vehicle that was involved in a slow speed pursuit and eventually stopped by the Natchitoches Police Department. Plaintiffs allege that, when the occupants were removed from the vehicle, Marlon Grant was observed to be chewing on something and

---

[2] Sheriff Victor Jones, Jr. was substituted as defendant for the Natchitoches Parish Sheriff's Department by plaintiffs (Doc. 14).  The claims against the City of Natchitoches Police Department were dismissed (Doc. 22).

Since the "unknown employees of the Natchitoches Parish Sheriff's Department" have never been identified and served, the complaint against these defendants should be dismissed without prejudice under Fed.R.Civ.P. 4(m).  See McGinnis v. Shalala, 2 F.3d 548, 550 (5th Cir. 1993), cert. den., 510 U.S. 1191, 114 S.Ct. 1293, 127 L.Ed.2d 647 (1994); Systems Signs Supplies v. U.S. Dept. of Justice, 903 F.2d 1011, 1013 (5th Cir. 1990); Kersh v. Derosier, 851 F.2d 1509, 1512 (5th Cir. 1988).

was ordered to open his mouth and spit it out, but he failed to do so.  Plaintiffs allege that, while talking to the police, Marlon Grant then spit out what was suspected to be and tested positive for crack cocaine.  Plaintiffs allege that Marlon Grant was then arrested and taken to the Natchitoches Parish Detention Center; while there, officers attempted to remove other items from Grant's mouth and used a taser on his back.  Plaintiffs allege that Marlon Grant was then taken to the booking room where he began to have seizure-like convulsions and fell from his chair.  Emergency medical services transported Grant to the Natchitoches Regional Medical Canter, where he died.

Sheriff Jones, Caballero, Lacaze, and Sers filed a motion for summary judgment (Doc. 25).  The City of Natchitoches, Evans, and Meziere also filed a motion for summary judgment (Doc. 34).  Those motions have not been opposed by plaintiffs and are now before the court for disposition.

<u>Law and Analysis</u>

<u>Summary Judgment</u>

Rule 56 of the Federal Rules of Civil Procedure mandates that the court shall grant a summary judgment:

> "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Paragraph (e) of Rule 56 also provides the following:

> "If a party fails to properly support an assertion of fact or fails to properly address another party's

3

assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it; or (4) issue any other appropriate order."

Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a genuine issue to be tried.

In this regard, the substantive law determines what facts are "material."  A material fact issue exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  However, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff.  Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999), 528 U.S. 906, 120 S.Ct. 249 (1999), and cases cited therein.

If the movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for

trial.   In  this  analysis,  we  review  the  facts  and  draw  all
inferences  most  favorable  to  the  nonmovant.   Herrera v. Millsap,
862  F.2d  1157,  1159  (5th  Cir.  1989).   However,  mere  conclusory
allegations  are  not  competent  summary  judgment  evidence,  and  such
allegations  are  insufficient,  therefore,  to  defeat  a  motion  for
summary  judgment.   Topalian v. Ehrman,  954  F.2d  1125,  1131  (5th
Cir.),  cert.  den.,  506  U.S.  825,  113  S.Ct.  82  (1992).

Qualified Immunity

     Defendants  contend  they  are  entitled  to  qualified  immunity.
The  defense  of  qualified  immunity  protects  a  public  official  from
both  litigation  and  liability,  absent  a  showing  that  the  official
violated  a  constitutional  right  that  was  clearly  established  at  the
time  of  the  incident.   Woods v. Smith,  60  F.3d  1161,  1164  (5th  Cir.
1995),  cert.  den.,  516  U.S.  1084,  116  S.Ct.  800  (1996).   Qualified
immunity  cloaks  a  police  officer  from  personal  liability  for
discretionary  acts  which  do  not  violate  well  established  law.
Officers  also  have  qualified  immunity  if  their  actions  could
reasonably  have  been  thought  consistent  with  the  right  they  are
alleged  to  have  violated.   Richardson v. Oldham,  12  F.3d  1373,
1380-81  (5th  Cir.  1994),  and  cases  cited  therein.   Qualified
immunity  operates  to  ensure  that  before  they  are  subjected  to  suit,
officers  are  on  notice  their  conduct  is  unlawful.   Hope v. Pelzer,
536  U.S.  730,  122  S.Ct.  2508,  2515  (2002).

     The  bifurcated  test  for  qualified  immunity  is:  (1)  whether  the

plaintiff has alleged a violation of a clearly established constitutional rights; and, (2) if so, whether the defendant's conduct was objectively unreasonable in the light of the clearly established law at the time of the incident.  Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir. 1998), and cases cited therein.

The first step is to determine whether the plaintiff has alleged violation of a clearly established constitutional right. This analysis is made under the currently applicable constitutional standards.  Hare, 135 F.3d at 325.  A constitutional right is clearly established if, in light of pre-existing law, the unlawfulness is apparent.  Officials must observe general, well-developed legal principles.  Doe v. Taylor Independent School Dist., 15 F.3d 443, 445 (5th Cir.), cert. den., 513 U.S. 815, 115 S.Ct. 70 (1994).

The second prong of the qualified immunity test is better understood as two separate inquiries: (1) whether the allegedly violated constitutional rights were clearly established at the time of the incident and, if so, (2) whether the conduct of the defendants was objectively unreasonable in the light of that then clearly established law.  Hare, 135 F.3d at 325-36.  Objective reasonableness is a question of law for the court.  The analysis for objective reasonableness is different from that for deliberate indifference (the subjective test for addressing the merits).  For qualified immunity, the subjective deliberate indifference standard

serves only to demonstrate the clearly established law in effect at the time of the incident and, under that standard (the minimum standard not to be deliberately indifferent), the actions of the individual defendants are examined to determine whether, as a matter of law, they were objectively unreasonable.  <u>Hare</u>, 135 F.3d at 328.

The qualified immunity doctrine does not protect an official whose subjective intent was to harm the plaintiff, regardless of the objective state of the law at the time of his conduct.  <u>Douthit v. Jones</u>, 619 F.2d 527, 533 (5th Cir. 1980).  A party seeking to avoid a qualified immunity defense must prove that the official either actually intended to do harm to him, or took an action which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result.  <u>Douthit</u>, 619 F.2d at 533.

Invocation of the qualified immunity defense shifts the burdens of proof in federal civil rights lawsuits brought against public officials for actions or omissions attending their performance of official duties:

> "The defendant official must initially plead his good faith and establish that he was acting within the scope of his discretionary authority. Once the defendant has done so, the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law."

<u>Bazan v. Hidalgo County</u>, 246 F.3d 481, 489 (5th Cir. 2001), citing <u>Salas v. Carpenter</u>, 980 F.2d 299, 306 (5th Cir. 1992).

<u>Plaintiffs' Claims</u>

Plaintiffs contend in their complaint that defendants violated Marlon Grant's constitutional right against the use of excessive force, and the City of Natchitoches is vicariously liable for the acts of its employees in the city police and the sheriff's department, and that defendants are liable under state law for assault, battery, abuse of process, intentional infliction of emotional distress, false arrest, false imprisonment, negligence, gross negligence, and "intentional torts."   Plaintiffs do not allege specific acts or omissions by the defendants to support these claims, and have not contested defendants' submissions on summary judgment.

<u>Defendants' Summary Judgment Evidence</u>

1. Sheriff's Department Defendants'
Statement of Undisputed Facts

The Sheriff's department defendants (Sheriff Jones and Deputies Sers, Lacaze and Caballero) show in their uncontested statement of undisputed facts (Doc. 25) that they stopped Brandon Johnson's vehicle on September 26, 2011 due to seatbelt violations (Doc. 25).   Defendants further show that Johnson refused to stop initially and became involved in a slow speed pursuit with law enforcement (Doc. 25).   When Johnson stopped his vehicle, the deputies saw Grant eating something; when the deputies asked him

8

what he was chewing and ordered him to spit it out, he refused to comply.  However, while attempting to speak, Grant inadvertently spit out a piece of white substance which tested positive for cocaine (Doc. 25).  A piece of cellophane bag in the vehicle also tested positive for cocaine (Doc. 25).  Upon arrival at the detention center, Officer Evans saw that Grant was again chewing something, but Grant would not open his mouth or spit the substance out, although Deputy LaCaze issued multiple warnings to Grant to spit the substance out or else he would be tased (Doc. 25).  Deputy LaCaze stunned Grant with his taser; Grant was then transported to the booking area of the detention center, where he went into a seizure (Doc. 25).  Officer Evans contacted emergency medical services and Grant was transported by ambulance to the Natchitoches Regional Medical Center where he later died (Doc. 25).

## 2. Deputy Sers' Affidavit

An affidavit by Deputy Sers shows that Sers noticed the occupants of Johnson's vehicle were not wearing seatbelts, so he put on his warning lights and made eye contact with the driver; when the driver refused to stop, he put on his siren and engaged in a slow speed pursuit (Doc. 25, Ex. A).  Sers states in his affidavit that Deputy LaCaze joined the slow speed pursuit, initiated a rolling road block, and forced Johnson to stop (Doc. 25, Ex. A).  Sers states that, while he and LaCaze secured the driver, he overheard Officer Evans and Deputy Caballero order

Grant, several times, to open his mouth and spit the items out, but Grant refused to comply (Doc. 25, Ex. A).   Deputy Sers further states that he noticed Grant's speech was muffled, but he could not tell whether it was because he had a foreign object in his mouth or because he had gold grills on his upper and lower teeth (Doc.25, Ex. A).   Deputy Sers states that he took the test swabs, of the white substance that fell from Grant's mouth and of the cellophane bag found in the vehicle, and put them in his unit (Doc. 25, Ex. A).   Sers further states that Grant denied eating anything and denied having anything in his mouth, but refused to open his mouth for officers to verify it was empty (Doc. 25, Ex. A).   Deputy Sers then left to assist with a search, and returned in time to see Grant lying on the floor of the holding area, conscious, breathing rapidly, and refusing to answer questions; his glasses were broken, one of his gold teeth and his cell phone were on the floor, and there was a small amount of blood on the phone (Doc. 25, Ex. A). While they waited on emergency medical services, the driver of the vehicle, Johnson, stated that he was not aware that Grant had any medical problems (Doc. 25, Ex. A).   Grant was given a pen and paper and wrote "num," which he indicated meant his mouth was numb (Doc. 25, Ex. A).   Sers states that, later, Johnson told the police that, before he and Grant exited his vehicle, Grant put "some paper" inside his mouth and washed it down with beer (Doc. 25, Ex. A).

                    3. Deputy LaCaze's Affidavit

                              10

Deputy LaCaze states in his affidavit (Doc. 25, Ex. B) that he assisted Deputy Sers in stopping Johnson's vehicle by pulling in front of it and forcing the driver to pull over (Doc. 25, Ex. B). Deputy LaCaze states that, when he approached Johnson's vehicle, he saw Marlon Grant take a drink of beer before he exited the vehicle (Doc. 25, Ex. B).  Deputy LaCaze states that he heard the other officers ask Grant several times what he was eating, to which Grant responded "nothing" (Doc. 25, Ex. B).  When questioned, Johnson told Deputy LaCaze that he did not see Grant eat anything (Doc. 25, Ex. B).  Deputy LaCaze further states in his affidavit that, when they arrived at the detention center, he noticed Grant had trouble exiting the police vehicle and also noticed that he was chewing something (Doc. 25, Ex. B).  When ordered to spit it out, Grant tried to swallow the object, so Officer Evans grabbed Grant by his Adam's apple to try to prevent him from swallowing the object (Doc. 25, Ex. B).  Grant refused to spit it out and kept chewing and trying to swallow, so Officer Evans took Grant to the ground, but Grant still would not spit the object from his mouth (Doc. 25, Ex. B).  Deputy LaCaze states that he then placed his taser on Grant's back, between his shoulder blades, and told Grant that he would be tased if he did not open his mouth; when Grant refused, Deputy LaCaze stunned him for one second (Doc. 25, Ex. B).  When Grant still refused to open his mouth, Deputy LaCaze again warned Grant he would be tased again if he did not open his mouth; when Grant

11

again refused, he was tased for two seconds (Doc. 25, Ex. B). Deputy LaCaze stated that he continued to give Grant loud verbal commands to spit out whatever was in his mouth but he refused and kept trying to swallow the object, so Grant was stunned again for two to three seconds (Doc. 25, Ex. B).  Deputy LaCaze states he then put the taser away because it was not working, and Grant was picked up and taken inside the detention center (Doc. 25, Ex. B).

Deputy LaCaze also states in his affidavit that, inside, he continued to order Grant to open his mouth but he refused, so LaCaze held Grant's nose and pulled down on his bottom lip to try to open his mouth, but was unsuccessful (Doc. 25, Ex. B). According to Deputy LaCaze, Grant then suddenly yelled, stiffened up, and fell off his chair, hitting his head on the standing phone in the corner by the chair (Doc. 25, Ex. B).  Grant then lay on his side, bleeding from the mouth area, and his glasses, which were broken during the fall, were on the floor with his "tooth cover" (Doc. 25, Ex. B).  Deputy LaCaze again tried to open Grant's mouth, and saw his bottom gold tooth cover had come off and was in his mouth; he told Grant to spit it out before he choked on it (Doc. 25, Ex. B).  Deputy LaCaze states that he asked Johnson what Grant had eaten and Johnson said "nothing."  The medics also told Grant to spit out his tooth cover and anything else in his mouth, and asked him what he had eaten; Grant indicated he had eaten "nothing" (Doc. 25, Ex. B).  Deputy LaCaze states that he again tried to look

12

in Grant's mouth, but when the paramedics arrived Grant got out of his chair, walked to the stretcher and lay on it; when Grant was carried out of the room, he was sitting up and alert (Doc. 25, Ex. B).

Deputy LaCaze further states in his affidavit that he went to the hospital after he finished the booking procedures, and found Grant lying on his bed, unresponsive, with "black stuff" coming out of his mouth (Doc. 25, Ex. B).  Deputy LaCaze states that a nurse began to suction Grant's mouth area with a suction tube, but Grant stiffened up and began to jerk, his blood pressure and pulse dropped, and he was moved to another room (Doc. 25, Ex. B).  The medical staff was unable to revive Grant (Doc. 25, Ex. B).

### 4. Deputy Caballero's Affidavit

Deputy Caballero states in his affidavit that he was a passenger in Deputy Sers' vehicle on September 26, 2011; when he and Sers saw the occupants of Johnson's vehicle were not wearing seatbelts, they attempted to stop the vehicle by activating lights and sirens, but the driver did not stop (Doc. 25, Ex. C).  Deputy Caballero further states in his affidavit that they pursued Johnson's vehicle until Deputy LaCaze forced it to stop (Doc. 25, Ex. C).  When they approached the vehicle, Officer Evans saw Grant was eating something; Officer Evans and Deputy Caballero gave loud verbal commands to Grant to get out of the truck, but he did not comply (Doc. 25, Ex. C).  Deputy Caballero noticed that Grant had

13

his hands over his mouth and appeared to be chewing something, so he holstered his weapon while Officer Evans opened the door, and pulled Grant out of the truck by his right arm (Doc. 25, Ex. C). Officer Caballero states that he applied a straight arm bar take-down, controlling Grant's rate of descent to the ground, and he and Evans ordered Grant to spit out the item in his mouth (Doc. 25, Ex. C). Deputy Caballero states in his affidavit that, when Grant did not comply, he applied the non-compliant handcuffing technique which allowed Officer Evans to handcuff Grant, then patted him down for weapons while he was on the ground (Doc. 25, Ex. C). Deputy Caballero states they then picked Grant up, performed a more thorough pat-down search for weapons, and found a portable radio in the crotch of Grant's pants; they believed Grant had the radio set to the Natchitoches Police Department frequency (Doc. 25, Ex. C). According to Deputy Caballero, Grant said he had the radio because he was employed by the City of Natchitoches and was on call (Doc. 25, Ex. C). Grant was then identified from his driver's license; a wad of cash was found in his pocket (Doc. 25, Ex. C). Deputy Caballero states that he again asked Grant to spit the item out of his mouth but Grant refused, so Caballero applied the combination clamp touch pressure to the mandibular angle and the hypoglossal nerve pressure point to gain pain compliance, in order to get Grant to spit the item out of his mouth, but the technique did not work (Doc. 25, Ex. C). Deputy Caballero stated that he noticed a small

14

piece of white substance on Grant's bottom lip which Deputy Sers was able to collect; a field test confirmed it was cocaine (Doc. 25, Ex. C).   Deputy Caballero then placed Grant in LaCaze's unit and read him his Miranda rights, and placed Johnson in Ser's vehicle and read him his Miranda rights (Doc. 25, Ex. C).

Deputy Caballero states in his affidavit that he left to participate in a search; when he arrived later at the detention center, he saw Grant sitting in a chair next to the first desk on his left in the corner of the room next to the portable pay phone. Officer Evans was standing watch, Deputy LaCaze was sitting at the desk to the far left of the room, working on the computer, and a few corrections officers were in the room monitoring the situation (Doc. 25, Ex. C).

Deputy Caballero stated that Grant started to shake violently and fell out of the chair, hitting the left side of his face on the portable pay phone; there was a small pool of blood on the base of the pay phone, Grant's glasses were broken, and his gold upper grill was lying on the ground (Doc. 25, Ex. C).   Grant was breathing "weird" and not responding, so LaCaze ordered someone to call emergency medical services and asked a corrections officer to get a mask for Grant in case he needed to start CPR (Doc. 25, Ex. C).   LaCaze then placed Grant on his left side and stabilized him so he would not choke; after eight to twelve minutes, Grant showed signs of coming around (Doc. 25, Ex. C).   Grant then became

15

coherent and appeared to be holding something in his mouth; the officers noticed the gold grill for Grant's bottom tooth was not in place and they could not find it on the floor (Doc. 25, Ex. C). Deputy LaCaze picked up and examined Grant's upper grill and determined nothing was stuck in it; they asked Grant to open his mouth so they could retrieve the bottom grill to prevent him from choking on it, but he did not comply (Doc. 25, Ex. C).  Deputy Caballero states the fire department also tried a few different techniques to open Grant's mouth but failed; Grant did not say anything and seemed dazed and confused (Doc. 25, Ex. C).  Deputy Caballero asked Johnson if he knew what Grant had eaten and how much, but Johnson said he did not see Grant eat anything (Doc. 25, Ex. C).

Deputy Caballero further states in his affidavit that, when the paramedics arrived, Grant was reseated in the chair.  Grant refused to tell the paramedics what he had eaten, then he got up, walked across the room to the stretcher, and sat down (Doc. 25, Ex. C).  Deputy Caballero rode in the ambulance with Grant; Grant asked for but was not given a cigarette.  Grant again refused to open his mouth and denied having swallowed anything (Doc. 25, Ex. C). Deputy Caballero then placed leg shackles on Grant and escorted him into the emergency room, where Grant got up from the stretcher and lay down in the hospital bed (Doc. 25, Ex. C).  While the nurses tended to Grant, Grant asked Deputy Caballero what the charges were

and whether he could make a call; Deputy Caballero told Grant he could call after the doctors finished (Doc. 25, Ex. C).  Deputy Caballero states he then saw Grant moving something around in his mouth, but Grant refused to allow a nurse to check his mouth; when the seriousness of the situation was explained to him, Grant said his heart rate was so high because he had been drinking Hennessy (Doc. 25, Ex. C).  The nurse again asked Grant to open his mouth and Grant complied, but Grant's mouth was empty (Doc. 25, Ex. C). Another nurse then asked Deputy Caballero to deal with Grant's family because they were causing problems in the waiting room, so he left Sergeant Armstrong to watch Grant while he spoke to Grant's family (Doc. 25, Ex. C).  Deputy Caballero advised "the two females" that Grant was in his custody and he would keep them informed, which calmed them down (Doc. 25, Ex. C).

Deputy Caballero states in his affidavit that, when he returned to the room, Grant asked for water but was told he could not have any because he was going to be given charcoal (Doc. 25, Ex. C).  When Caballero asked Grant whether he would cooperate with the hospital staff, and whether this was "worth it," Grant stated it would be his fourth offense so "it would be life either way" (Doc. 25, Ex. C).  Deputy Caballero states that, a few minutes later, Grant clutched the hand rails of the bed, sat up, and in a weird voice asked for water again, then his eyes closed, his body tightened up, and he started to slide down toward the foot of the

bed (Doc. 25, Ex. C).  Deputy Caballero states that he held Grant's
leg with his left hand and waived for the hospital staff with his
right hand; the nursing staff tried different techniques to awaken
Grant, but he began to shake violently (Doc. 25, Ex. C).  Grant was
then moved to another room, where Deputy Caballero was asked to
remove the leg shackles and count the money in Grant's pocket
($831.00) (Doc. 25, Ex. C).  After a while, a nurse came out and
told them Grant was deceased (Doc. 25, Ex. C).

### 5. City of Natchitoches Defendants'   Statement of Undisputed Facts

The City of Natchitoches defendants (City of Natchitoches,
Officer Meziere, and Officer Evans) show in their uncontested
statement of undisputed facts (Doc. 34) that Grant was arrested on
September 26, 2011 and charged with possession of illegal drugs,
resisting arrest, and obstruction of justice.  The City defendants
further show that, at the time of his arrest, Grant was in
possession of cocaine and trying to evade arrest and destroy or
conceal evidence (Doc. 34).  The City defendants show that, when he
arrived at the detention center, Grant appeared to be chewing and
trying to swallow something, which Officer Evans and Deputy LaCaze
tried to prevent him from doing (Doc. 34).  Later, during the
booking process, Grant suffered seizure-like symptoms and medical
personnel were immediately notified, but minutes later Grant was
ambulatory and talking and was transferred to the emergency room
for evaluation (Doc. 34).  The City defendants also show, in their

statement of undisputed facts, that Grant died over an hour after he arrived at the hospital, his autopsy revealed that he had ingested a lethal level of cocaine, and the cause of his death was "acute intoxication of cocaine."  The City defendants show that, prior to his arrest, Grant had put an unknown amount of cocaine in his mouth, swallowed it, continuously denied that he had hidden or ingested drugs, and never told the officers or emergency medical personnel that he had swallowed cocaine (Doc. 34).  Finally, the City defendants show in their statement of undisputed facts that Grant's autopsy did not reveal any injuries inflicted by Officer Meziere or Officer Evans, and that the City of Natchitoches did not have any unconstitutional policy, custom, or practice that caused or resulted in Grant's death (Doc. 34).

### 6. Sergeant Meziere's Affidavit

The City of Natchitoches defendants show, in an affidavit by Sergeant Billy Meziere (Doc. 34), that on September 26, 2011, Meziere responded to Deputy Sers' request for assistance with obtaining a search warrant for Marlon Grant's home, and was told that Grant and another were under arrest (Doc. 34).  Meziere states that Grant had been under investigation for many months for distribution of cocaine (Doc. 34).  Meziere further states in his affidavit that, after he obtained a search warrant, he assisted in executing the warrant and was not present when Grant was arrested, transported to the detention center, booked, or transported to the

hospital (Doc. 34).  Meziere states in his affidavit that he did
not see or have any direct contact or interaction with Grant, and
that the City of Natchitoches does not have a custom, policy or
practice of arresting people without probable cause, using
excessive force, or denying medical treatment to arrestees (Doc.
34).

### 7. Officer Evans' Affidavit

The affidavit of City of Natchitoches Police Officer Floyd
Evans shows that, on September 26, 2011, he was a passenger in
Deputy LaCaze's vehicle when they received a call from Deputy Sers,
requesting assistance with stopping Johnson's vehicle (Doc. 34).
Officer Evans states in his affidavit that, as Deputy LaCaze drove
next to Johnson's vehicle, Evans observed Grant putting something
in his mouth (Doc. 34).  Deputy LaCaze then pulled in front of
Johnson's vehicle and forced it to stop; when Officer Evans
approached Johnson's vehicle, he saw Grant drink from a beer can
(Doc. 34).  Officer Evans states that he and the other officers
yelled commands to Grant to get out of the vehicle, but Grant
refused to comply, sitting there with his door locked and the
window down (Doc. 34).  Officer Evans states in his affidavit that
he had to reach inside the vehicle and open the door from the
inside, then they pulled Grant out of the vehicle and handcuffed
him (Doc. 34).  Officer Evans states that it looked like Grant was
chewing on something, so he asked Grant what he was chewing and

told him to spit it out, but Grant denied that he was chewing on anything and denied that he had anything in his mouth, but refused to open his mouth (Doc. 34).  Officer Evans then went to assist with the search of the vehicle; the items found included the top of a small knotted plastic bag with the rest of the bag missing, electronic scales, and an open beer can (Doc. 34).

Officer Evans states in his affidavit that he then assisted Deputy LaCaze in transporting Grant to the detention center; when they arrived at the detention center, Officer Evans noticed that Grant appeared to be chewing or trying to swallow something (Doc. 34).  Officer Evans states that he instructed Grant to spit out whatever was in his mouth, but he refused, so he placed his hand on the front of Grant's neck for a few seconds to prevent him from swallowing and to get him to spit out whatever he had, but Grant still refused.  Evans states that he did not choke Grant or cut off his air supply or blood flow (Doc. 34).  Officer Evans states that he and Deputy LaCaze put Grant on the floor and told him to open his mouth and spit it out, and Deputy Lacaze told Grant that he would taser him if he did not spit out whatever was in his mouth (Doc. 34).  Officer Evans states in his affidavit that he did not see Deputy LaCaze use his taser, but he heard the taser and heard Deputy LaCaze tell Grant that he would taser him again if he did not spit out what was in his mouth (Doc. 34).  Officer Evans states in his affidavit that Deputy LaCaze then told Evans to get Grant up

and take him into the booking area; Evans escorted Grant there and
sat him in a chair (Doc. 34).

Officer Evans further states in his affidavit that, a short
time later, Grant appeared to fall from the chair to the floor and
appeared to have a seizure (Doc. 34). Officer Evans states that he
and other officers tried to help Grant by removing the handcuffs
and attempting to make sure his airway remained clear; Evans
immediately requested an ambulance (Doc. 34). Officer Evans states
that, before the emergency responders arrived, the seizure-like
symptoms stopped and Grant got up and sat in the chair again.
According to Evans, Grant told the emergency responders that he had
not swallowed anything, then he walked to the stretcher and was
transported by ambulance to the Natchitoches Regional Medical
Center (Doc. 34). Officer Evans states in his affidavit that,
during the course of those events, Grant continually denied having
anything in his mouth, denied chewing on or swallowing anything,
and refused to open his mouth (Doc. 34). Afterward, Officer Evans
was informed that Deputy Sers had found a small white piece of
residue that had fallen from Grant's mouth and had field-tested
positive for cocaine (Doc. 34). Officer Evans also states in his
affidavit that, prior to the seizure-like episode, Grant did not
exhibit any signs or symptoms that indicated he needed medical
attention. Officer Evans states that he did not ignore any
complaints from Grant, did not refuse to get Grant medical

22

treatment, did not intentionally treat Grant incorrectly, was not aware of a risk of serious harm to Grant, and did not intend to cause Grant harm or pain (Doc. 34).  Finally, Officer Evans states in his affidavit that the City of Natchitoches does not have a custom, policy or practice of arresting persons without probable cause, using excessive force, or denying medical care to arrestees (Doc. 34).

### 8. Autopsy Report

All of the defendants submitted the report of death for Grant, which showed his urine screen tested positive for cocaine (Docs. 25, 34), and the autopsy report (Docs. 25, 34).  The autopsy report for Marlon Grant showed that Grant was 6' tall and weighed 187 pounds.  The cause of death was determined to be acute intoxication of cocaine by accident (Doc. 34).  The final anatomic diagnosis was (1) acute intoxication of cocaine (lethal level of cocaine in postmortem blood, a history of having been seen swallowing crack cocaine, a urine screen positive for cocaine, and gastric contents that included a gold dental grill, a small broken plastic bag, and 200 ml of charcoal-saturated liquid), (2) hypertensive cardiovascular disease (cardiomegaly with concentric hypertrophy of the left ventricle)), and (3) two taser marks on his back.  No injuries were found other than the two taser burn marks on Grant's back, although Grant had numerous small, old scars and his nostrils contained a small amount of blood (Docs. 25, 34).

False Arrest/Imprisonment

Plaintiff allege Section 1983 and state law claims that Grant was falsely arrested and/or imprisoned by the defendants.

1.

The constitutional torts of false arrest, unreasonable seizure, and false imprisonment require a showing that there was no probable cause for the arrest. Brown v. Lyford, 243 F.3d 185, 189 (5th Cir. 2001), cert. den., 122 S.Ct. 46 (U.S. 2001). The right to be free from arrest without probable cause is a constitutional right that was clearly established in 2011. See Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225 (1964) (the right to be free from arrest without probable cause is a clearly established constitutional right).

For an arrest to be lawful, it must be supported by probable cause. Flores v. City of Palacios, 381 F.3d 391, 402 (5th Cir. 2004). An officer has probable cause to arrest if, at the time of the arrest, he had knowledge that would warrant a prudent person's belief that the person arrested had already committed or was committing a crime. See Gladden v. Roach, 864 F.2d 1196, 1199 (5th Cir.), cert. den., 491 U.S. 907, 109 S.Ct. 3192 (1989). Also, Resendiz v. Miller, 203 F.3d 902, 903 (5th Cir. 2000); Hunter v. Bryant, 502 U.S. 224, 228, 112 S.Ct. 534 (1991). If probable cause for an arrest even arguably existed, immunity cannot be lost.

Brown, 243 F.3d at 190.  A police officer has qualified immunity if he "reasonably but mistakenly conclude[s] that probable cause is present."  Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534 (1991), citing quoting Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034 (1987).

In the case at bar, defendants' show they initially signaled for Johnson to stop his vehicle because neither he nor Grant were wearing seatbelts.[3]  Johnson refused to stop; when he was stopped, open containers of beer were visible in his vehicle and Grant was seen drinking from a beer can just prior to the stop.  Grant then refused to comply with orders to exit the vehicle, Grant was seen attempting to chew and swallow something, Grant refused to open his mouth as ordered, a piece of cocaine fell from Grant's mouth, cocaine residue was found on part of a cellophane bag in the vehicle, and electronic scales were found in the vehicle.  Grant was charged with resisting arrest, obstruction of justice, and possession of illegal drugs.

Plaintiffs have not offered any evidence to show that defendants did not have probable cause to arrest Grant.  Grant's possession of an open container and consumption of beer in the moving vehicle,[4] his refusal to exit the vehicle,[5] his obvious

---

[3] See La. R.S. 32:295.1, Safety belt use.

[4] See La.R.S. 32:300, Possession of alcoholic beverages in motor vehicles.

[5] See La.R.S. 32:56.

attempt to chew and swallow what was determined to be cocaine[6] (proven in a field test after a piece fell from his mouth), and his possession of cocaine (proven in field tests on the bag with cocaine residue and the cocaine that fell from his mouth) provided the officers with probable cause to arrest Grant.

Therefore, are no genuine issues of material fact which would preclude a summary judgment in favor of defendants on this issue.

2.

Plaintiffs also allege supplemental state law claims for false arrest. Louisiana state law recognizes the tort of false arrest. Alvarado v. Poche, 2002-2 (La. App. 3d Cir. 6/5/02), 819 So.2d 1150, 1152. In order for a plaintiff to recover for false arrest, he must prove that he was unlawfully detained by the police against his will. Thus, two elements are required to prove a case in false arrest and imprisonment: (1) detention of a person, and (2) unlawfulness of the detention. Dumas v. City of New Orleans, 2001-0448 (La.App. 4 Cir. 12/05/01), 803 So.2d 1001, 1003, writ den., 2002-0024 (La. 3/15/02) 811 So.2d 912, citing Harrison v. State Through Dept. of Public Safety and Corrections, 97-1086 (La. 12/1/98), 721 So.2d 458, 461; Hughes v. Gulf International, 593 So.2d 776, 780 (La. App. 4th Cir. 1992), writ den., 595 So.2d 658 (La. 1992).

As discussed above, the uncontested summary judgment evidence

---

[6] See La.R.S. 14:130.1.

shows that defendants had probable cause to arrest Grant. Therefore, there are no genuine issues of material fact which would preclude a summary judgment on this issue.

Defendants' uncontested motions for summary judgment should be granted as to plaintiffs' Section 1983 and supplemental state law claims for false arrest/imprisonment.

Excessive Force, Assault, Battery, Intentional Torts

Plaintiffs allege both Section 1983 and state law claims based on the use of excessive force by defendants when they arrested Grant.

1.

To state a Section 1983 claim for excessive force in violation of the Constitution, a plaintiff must allege (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need, and the excessiveness of which was (3) objectively unreasonable. In gauging the objective reasonableness of the force used by a law enforcement officer, the court must balance the amount of force used against the need for that force. Ikerd v. Blair, 101 F.3d 430, 433-34 (5th Cir. 1996). Also, Buchanan v. Gulfport Police Dept., 530 F.3d 307, 312 (5th Cir. 2013). The amount of force that is constitutionally permissible, therefore, must be judged by the context in which that force is deployed. Ikerd, 101 F.3d at 434. The constitutional right

27

against the excessive use of force by a law enforcement officer was clearly established in 2011.

A plaintiff asserting an excessive force claim is required to show he suffered at least some form of injury.  The injury must be more than a de minimis injury and must be evaluated in the context in which the force was deployed.  Glenn v. City of Tyler, 242 F.3d 307, 314 (5th Cir. 2001); Williams v. Bramer, 180 F.3d 699, 703-704 (5th Cir.), clarified on rehearing, 186 F.3d 633 (5th Cir. 1999).

The only evidence of an injury to Grant are the two taser burns on his back and the presence of blood on his face and in his nostrils, according to the autopsy report and the affidavits from defendants.  According to defendants' uncontested evidence, Grant was tasered twice by Deputy LaCaze in an effort to force him to spit out whatever was in his mouth, which was apparently cocaine. Defendants uniformly contend in their affidavits and statement of undisputed facts that Grant steadfastly refused to open his mouth or to spit out what was in his mouth, despite repeated orders by law enforcement to do so and requests by the emergency medical workers that he do so.  Grant likewise maintained to everyone, even the health care professionals, that he had not swallowed anything.

Despite many attempts to do so by different persons employing different techniques, the law enforcement personnel were ultimately unable to prevent Grant from swallowing what was proven (by the autopsy report) to be a lethal dose of cocaine.  Moreover,

according to Deputy Caballero's affidavit, Grant indicated that he was aware the cocaine could kill him and apparently preferred to take that risk over returning to prison on a fourth offense conviction.

Under the circumstances, the non-lethal use of a taser to try to prevent Grant from swallowing what turned out to be a lethal dose of cocaine was reasonable and clearly not excessive.

The autopsy report also indicates the presence of blood in Grant's nostrils, but does not indicate a cause.  The defendants showed that Grant had blood on his mouth after he fell out of his chair during his seizure.  There are obvious plausible causes for the blood, such as from repeated use of cocaine (see http://teens.drugabuse.gov/drug-facts/real- questions-real-teens), or from Grant hitting his head/face on the pay phone or floor when he fell from his chair during the seizure.  While those are possible causes, the actual cause of the blood is not proven in the record before the court.

The defendants' uncontested summary judgment evidence shows that defendants did not strike, physically abuse, or injure Grant. There are no genuine issues of material fact which would preclude a summary judgment in favor of defendants on this issue.

2.

Plaintiffs also allege state law claims for assault, battery, and other, unspecified "intentional torts."  Under Louisiana law,

the use of force when necessary to make an arrest is a legitimate police function, but unreasonable or excessive force is a breach of an officer's duty.  Kyle v. City of New Orleans, 353 So.2d 969 (La. 1977); La.C.Cr.P. art. 220.  Even in a situation where the arrest is lawful, a police officer may only use reasonable force to effect the arrest and detention and to overcome any resistance or threatened resistance of the person being arrested or detained. Whether or not a police officer has used unreasonable or excessive force is determined according to the facts and circumstances of the case and various factors including the risks and dangers faced by officers, the nature of the offense involved, the existence of alternative methods of arrest and the physical size and strength of the officers as compared to that of the arrestee.  McDaniel v. Green, 99-1087 (La.App. 3 Cir. 12/22/99), 755 So.2d 942, 948-949, writ den., 2000-0200 (La. 3/24/00), 758 So.2d 151, citing Stroik v. Ponseti, 96-2897 (La. 9/9/97), 699 So.2d 1072, and Kyle v. City of New Orleans, 353 So.2d 969 (La. 1977).  Also, Westmoreland v. City of Natchitoches, 2000-00320 (La. App. 3 Cir. 10/4/00), 771 So.2d 715, 718.

As stated above, defendants' uncontested submissions show that defendants used reasonable force when they arrested Grant and, therefore, did not assault or batter Grant.

Since there are no genuine issues of material fact which would preclude a summary judgment, defendants' uncontested motions for

summary judgment should be granted as to plaintiffs' Section 1983 excessive force claim and related state law claims for assault, battery, and "intentional torts."


Denial of Medical Care, Negligence, Gross Negligence

Defendants also contend, under Section 1983 and state law, that defendants did not provide timely medical care for Grant.

1.

In a Section 1983 claim, the constitutional rights of a pretrial detainee flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment.  Hare v. City of Corinth, 74 F.3d 633, 638 (5th Cir. 1996).  If the complained-of harm is a particular act or omission of one or more officials, the action is characterized as an episodic act or omission of one or more officials, the action is characterized as an episodic act or omission case.  Flores v. Cty. of Hardeman, 124 F.3d 736, 738 (5th Cir. 1997), quoting Hare, 74 F.3d at 644-45.  For a discrete, episodic act, the detainee must establish a constitutional violation that was done with subjective deliberate indifference to the detainee's constitutional rights.  Once the detainee has met this burden, he has proven a violation of his rights under the Due Process clause.  Scott v. Moore, 114 F.3d 51, 54 (5th Cir. 1997).

The Supreme Court defined "deliberate indifference" as "subjective recklessness," or, in other words, a conscious

disregard of a substantial risk of serious harm.  Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 1980 (1994).  An official is deliberately indifferent to serious medical needs of detainees or prisoners if he intentionally denies or delays access to medical care.  Walker v. Butler, 967 F.2d 176, 178 (5th Cir. 1992); Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987).  The constitutional right to timely medical care was clearly established in 2011.

In the case at bar, defendants' uncontested summary judgment evidence shows that, although the officers suspected that Grant may have swallowed some cocaine, since they appeared to have known (from the cocaine that fell from his mouth), they were not sure that he had actually swallowed any.  Grant continuously denied having done so, Johnson did not share that information, and Grant did not have any obvious ill effects until he had a seizure in the booking room; emergency medical services were immediately called and he was transported to the emergency room.  Even in the emergency room, Grant did not admit to the medical personnel that he had ingested cocaine; that was later proven from the blood tests.  Therefore, defendants' uncontested evidence shows that defendants did not consciously disregard a substantial risk of serious harm to Grant.

Defendants' uncontested submissions show they tried very hard to persuade or force Grant to spit out the substances in his mouth,

and provided Grant with timely medical care as soon as they were aware there was something wrong with him.  Plaintiffs have not alleged or shown what else defendants could have done that would have saved Grant's life.  There are no genuine issues of material fact that would preclude a summary judgment in favor of defendants on this issue.

2.

Plaintiffs also allege a state law claim for negligence/gross negligence, contending defendants failed to provide timely medical care to Grant, pursuant to La.C.C. art. 2315, et seq.  To prevail on a negligence claim under La. Civil Code arts. 2315 and 2316, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element).  Brown v. Lee, 94-104 (La.App. 5 Cir. 7/13/94), 639 So.2d 897, 898-899, writ den., 94-2127 (La. 11/18/94), 646 So.2d 378, citing Roberts v. Benoit, 605 So.2d 1032 (La. 1992); Fowler v. Roberts, 556 So.2d 1, 4 (La. 1989).

A police officer owes a duty to a prisoner to protect him from harm and to preserve his safety.  The police officer must do what is reasonable under the circumstances.   It is the duty of the officer to see that reasonable medical service is provided to a prisoner if and when his physical condition discloses the need of such services.  Brown, 639 So.2d at 897-899, citing; Griffis v. Travelers Insurance Company, 273 So.2d 523 (La. 1973); Barlow v. City of New Orleans, 257 La. 91, 241 So.2d 501 (1970); Fruge v. City of New Orleans, 613 So.2d 811, 814 (La. App. 4th Cir. 1993), writ den., 620 So.2d 840 (La. 1993); Abraham v. Maes, 430 So.2d 1099 (La. App. 4th Cir. 1983); Cobb v. Jeansonne, 50 So.2d 100, 106 (La. App. 2nd Cir. 1951).

In the case at bar, the defendants had a duty to provide medical care to Grant when his physical condition indicated it was necessary, and it is undisputed that the defendants provided immediate medical care to Grant when he had a seizure.  Defendants' uncontested submissions show they did not know he required medical care before that time, despite their efforts to determine whether he had swallowed drugs.  Therefore, plaintiffs have not shown that defendants were negligent in their duty to provide reasonable medical care to Grant when it became evident that he needed it.

Since there are no genuine issues of material fact which would preclude a summary judgment, defendants' uncontested motions for summary judgment should be granted as to plaintiffs' Section 1983

and state law claims for denial of medical care.

Intentional Infliction of Emotional Distress

Plaintiffs allege a state law claim for intentional infliction of emotional distress.  In White v. Monsanto Co., 585 So.2d 1205, 1209-10 (La. 1991), the Louisiana Supreme Court found that a cause of action for intentional infliction of emotional distress exists in Louisiana, stating that:

> [I]n order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

Plaintiffs have not alleged what specific conduct by defendants was "extreme and outrageous," nor does the summary judgment evidence show that any of their conduct could be so characterized.

Since there are no genuine issues of material fact which would preclude a summary judgment, defendants' uncontested motions for summary judgment should granted as to plaintiffs' state law claim for intentional infliction of emotional distress.

Abuse of Process

Plaintiffs allege a state law claim for abuse of process.  To state a cause of action for the tort of abuse of process, a plaintiff must allege two essential elements: (1) the existence of an ulterior purpose; and (2) a willful act in the use of the

35

process not proper in the regular prosecution of the proceeding. Abuse of process involves the misuse of a process already legally issued whereby a party attempts to obtain a result not proper under the law.  Thus, the regular use of process does not constitute an abuse of process; there must be a showing of an abuse through an illegal, improper, or irregular use of process.  Waguespack, Seago and Carmichael (A PLC) v. Lincoln, 99-CA-2016 (La. App. 1st Cir. 9/22/2000), 768 So.2d 287, 291 and cases cited therein.

Plaintiffs have not alleged or shown how the defendants used the stop, arrest, and booking processes improperly, irregularly or illegally, and the summary judgment evidence does not indicate that they did so.  Since there are no genuine issues of material fact which would preclude a summary judgment, defendants' uncontested motions for summary judgment should be granted as to plaintiffs' state law claim for abuse of process.


The City of Natchitoches

Plaintiffs contend the City or Natchitoches is vicariously liable to plaintiffs, under both Section 1983 and state law, for the harm caused by the defendants.

1.

In Monell v. New York City Dept. of Social Services, 436 U.S. 658, 689, 98 S.Ct. 2018, 2035 (1978), the Supreme Court held that municipalities and other local governmental bodies are "persons"

within the meaning of Section 1983, and that, since there is no respondeat superior liability under Section 1983, a municipality may not be held liable under Section 1983 solely because it employs a tortfeasor.

The Supreme Court has also held that a plaintiff seeking to impose liability on a municipality under Section 1983 is required to identify a municipal "policy" or "custom" that caused the plaintiff's injury.  Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.  <u>Board of Cty. Comm'rs of Bryan Cty. v. Brown</u>, 520 U.S. 397, 403-404, 117 S.Ct. 1382, 1388 (1997).  In <u>Burge v. Parish of St. Tammany</u>, 187 F.3d 452, 471 (5th Cir. 1999), the Fifth Circuit explained that the official policy requirement may be met in at least three different ways: (1) when the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy, (2) where no official policy was announced or promulgated but the action of the policymaker itself violated a constitutional right; and (3) even when the policymaker fails to act affirmatively at all, if the need to take some action to control the agents of the local governmental entity is so obvious, and the inadequacy of existing practice so likely to result in the

violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need. Burge, 187 F.3d at 471, and cases cited therein.

Plaintiffs appear to allege that the City of Natchitoches has a policy or custom of allowing or encouraging its law enforcement personnel to falsely arrest and imprison people, use excessive force, and deny medical care to arrestees. However, plaintiffs have not provided any incidents which prove that such customs or unofficial policies exist, nor have they pointed to any official policies.

First, the City of Natchitoches does not employ the Natchitoches Parish Sheriff's deputies. A deputy sheriff is an appointed public officer of his parish law enforcement district, of which the sheriff is the head. La.R.S. 13:5901-5912, 33:1433. Also, Lewis v. Jefferson Parish Sheriff's Office, 01-257 (La. App. 5th Cir. 9/25/01), 798 So.2d 249, 251.[7]   Therefore, the City of

---

[7] A suit against Sheriff Jones in his official capacity is actually a suit against the Natchitoches Parish Law Enforcement District. La.R.S. 33:1433, 33:9001. La. R.S. 33:9001, et seq., empower the sheriff to raise revenues to finance his facilities and services through the creation of a continuing legal entity in each parish known as a law enforcement district, whose corporate existence survives the term of office of any individual sheriff. Prator v. Caddo Parish, 38,085 (La. App. 2 Cir. 1/28/04), 865 So.2d 932, 936. As the chief executive officer for the parish Law Enforcement District, the Sheriff is the independent and final official policymaker for all of the law enforcement district. A deputy sheriff is an appointed public officer of his parish law enforcement district. La.R.S. 33:1433, 33:9001. Also, McNeese v. State of Louisiana, 2006 WL 1751055 (W.D.La. 2006); Lewis v. Jefferson Parish Sheriff's Office, 01-257 (La. App. 5th Cir. 9/25/01), 798 So.2d 249, 251; Craig v. St. Martin

Natchitoches does not establish policies or customs for the management of the sheriff and his deputies.

Moreover, defendants' uncontested summary judgment submissions show that the City of Natchitoches does not have any customs or policies for its police officers which authorize false arrests, the use of excessive force, or the denial of medical care for arrestees.  Therefore, there are no genuine issues of material fact which would preclude a summary judgment on this issue.

2.

Plaintiffs also allege state law claims against the City of Natchitoches.  Louisiana state law imposes vicarious liability on a municipality for the excessive use of force by a police officer in effecting an arrest.  Lewis v. Goodie, 798 F.Supp. 382, 391 (W.D.La. 1992), citing Braud v. Painter, 730 F.Supp. 1, 9 (M.D.La. 1990); La.C.C. art. 2320; Lamkin v. Brooks, 498 So.2d 1068 (La. 1986); Cheatham v. City of New Orleans, 378 So. 2d 369, 375 n.7 (La. 1979); LeBrane v. Lewis, 292 So.2d 216 (La. 1974); Applewhite v. City of Baton Rouge, 380 So.2d 119 (La. App. 1st Cir. 1979); Taylor v. City of Baton Rouge, 233 So.2d 325 (La. App. 1st Cir.), writ ref'd, 256 La. 255, 236 So.2d 32 (La. 1970).

As stated above, the City does not employ and is not vicariously liable for the Sheriff's deputies; it is only liable

_____

Parish Sheriff, 861 F.Supp. 1290, 1300 (W.D.La. 1994), citing La. Const. Art. 5, § 27 ("[The sheriff] shall be the chief law enforcement officer in the parish.").

for the acts and omissions of the City police officers.  Moreover, as discussed above, since neither Natchitoches City Police Officer Meziere nor Officer Evans violated Grant's constitutional rights or rights under state law, the City has no vicarious liability in this case.

Since there are no genuine issues of material fact which would preclude a summary judgment, defendants' uncontested motions for summary judgment should be granted as to plaintiffs' Section 1983 and state law claims against the City of Natchitoches.


Natchitoches Parish Sheriff Jones

Finally, plaintiffs contend the Natchitoches Parish Sheriff, Victor Jones, Jr. is vicariously liable for the acts and omissions of his deputies, LaCaze, Sers, and Caballero.

Plaintiffs have named Sheriff Jones as a defendant in this case, apparently in his capacity as a supervisor since plaintiffs have not made any specific factual allegations which involve Sheriff Jones.

The doctrine of respondeat superior, which makes an employer or supervisor liable for an employee's alleged tort, is unavailable in suits under 42 U.S.C. §1983.  Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987).  Well settled §1983 jurisprudence establishes that supervisory officials cannot be held vicariously liable for their subordinates' actions.  Supervisory officials may be held

liable only if: (1) they affirmatively participate in acts that cause constitutional deprivation; or (2) implement unconstitutional policies that causally result in plaintiff's injury. <u>Mouille v. City of Live Oak, Tex.</u>, 977 F.2d 924, 929 (5th Cir. 1992), <u>cert. den.</u>, 508 U.S. 951, 113 S.Ct. 2443 (1993); <u>Thompkins</u>, 828 F.2d at 303.

Plaintiffs have not alleged or offered any proof of any acts or omissions of Sheriff Jones, or any unconstitutional policies implemented by Sheriff Jones, which deprived Grant of his constitutional rights. Therefore, plaintiffs have not shown that Sheriff Jones is liable to them in either his individual or official capacities under Section 1983.

2.

As for plaintiffs' state law claims, in Louisiana an employer is liable for a tort committed by his employee if, at the time, the employee is acting within the course and scope of his employment, i.e. acting in the exercise of the functions for which he is employed. <u>LeBrane v. Lewis</u>, 292 So.2d 216, 217-218 (La. 1974), citing La.C.C. art. 2320 and <u>Blanchard v. Ogima</u>, 253 La. 34, 215 So.2d 902 (1968). Also, <u>Albert v. Farm Bureau Ins. Co.</u>, No. CA 05-352 (La. App. 3d Cir. 11/2/2005) 916 So.2d 1238, 1241, aff'd, 2005-C-2496 (La. 10/17/2006) 940 So.2d 620.

There is no dispute as to whether Deputies LaCaze, Sers, and Caballero were acting within the course and scope of their

41

employment for the Sheriff at the time these events took place. However, since plaintiffs have not shown that the Deputies violated any of Grant's rights under state law, committed an intentional tort, or were in any way negligent, Sheriff Jones does not have any vicarious liability to plaintiffs under state law.

Since there are no genuine issues of material fact which would preclude a summary judgment, defendants' uncontested motions for summary judgment should be granted as to plaintiffs' Section 1983 and state law claims against Sheriff Jones.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the complaint against the "unknown employees of the Natchitoches Parish Sheriff's Department" should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m).

IT IS FURTHER RECOMMENDED that defendants' motions for summary judgment (Docs. 25, 34) be GRANTED and that plaintiffs' Section 1983 and supplemental state law actions against all defendants be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served

42

with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this _____ day of February 2014.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE